IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


JOHN MCCORMICK, *et al.*,          :

    Plaintiffs,          :
                           Case No. 3:06cv297

       vs.          :
                           JUDGE WALTER HERBERT RICE

THE NCR CORPORATION,          :

    Defendant.          :

---

DECISION AND ENTRY SUSTAINING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT (DOC. #34) AND OVERRULING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. #35);
JUDGMENT TO BE ENTERED ON BEHALF OF PLAINTIFFS AND
AGAINST DEFENDANT; TERMINATION ENTRY

---

A group of retired employees and spouses of retired employees have brought

this class action suit[1] against The NCR Corporation ("NCR"), alleging that NCR

wrongfully eliminated retiree life insurance benefits, in violation of the terms of

various Collective Bargaining Agreements ("CBAs") and in violation of NCR's

fiduciary and other duties under the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the Labor Management Relations Act

("LMRA"), 29 U.S.C. § 185.[2] Doc. #1.  The question presented, in this litigation, is

---

[1]This Court certified the class, pursuant to a stipulation between the parties.
Doc. #13; Not. Order, dtd. Apr. 7, 2008.

[2]A related case, <u>Hawk, et al. v. The NCR Corporation</u>, has been filed with
this Court as case number 3:06cv301, with the same Defendant and the same
legal issues, but with retirees under a later CBA as the Plaintiffs.

whether the retirees had a vested interest in the life insurance benefits, under the CBAs in effect at the time of their retirements. Each of the parties has moved for summary judgment, with the Plaintiffs arguing that the retirees had such vested interests (Doc. #34) and NCR arguing to the contrary (Doc. #35).

The Court will initially set forth the pertinent facts, followed by a review of the standard under which it must assess the parties' Motions. It will then conclude with an analysis of how the facts of this case fit within the parameters of the applicable law.

I.    Facts[3]

The interpretation of eight different CBAs are at issue, in the present case. For ease of reference the Court will refer to each Agreement by the year in which it first became effective, to wit: 1972 CBA (effective January 31, 1972); 1975 CBA (effective June 15, 1975); 1977 CBA (effective November 7, 1977); 1980 CBA (effective June 15, 1980); 1983 CBA (effective July 18, 1983); 1986 CBA (effective June 9, 1986); 1989 CBA (effective June 25, 1989); and 1992 CBA (effective June 28, 1992). The Court will now turn to an review of the pertinent

---

[3]Both parties have moved for summary judgment. When ruling on the Plaintiffs' Motion, the Court will consider the facts and circumstances giving rise to such Motion in the manner most favorable to the Defendant, as the party against whom the Motion is directed and, conversely, when ruling on the Defendant's Motion, the Court will consider the facts and circumstances giving rise to such Motion in the manner most favorable to the Plaintiffs. Servo Kinetics, Inc. v. Tokyo Precision Instruments, 475 F.3d 783, 790 (6th Cir. 2007).

provisions of the CBAs.[4]

As a general comment, the Plaintiffs received various benefits, to include life insurance benefits, under the terms of the CBAs that were in effect at the time of their retirements. On October 10, 2003, NCR notified all retirees receiving life insurance benefits that the same would be eliminated effective December 31, 2003. Doc. #1 ¶23.

### A. 1972 CBA[5]

#### 1. Life Insurance Entitlement

Under the 1972 Agreement, if an employee receives total and permanent disability benefits, certain benefits, including life insurance "shall be continued at

---

[4]Both parties have set forth extrinsic evidence for the Court's consideration. As the Sixth Circuit instructs,

> In interpreting collective bargaining agreements, we consider the language of the agreement, the context in which that language appears and other traditional canons of construction. If, after applying these rules of interpretation, the contract remains ambiguous, we permit the parties to introduce extrinsic evidence about their original understanding of the contract's terms.

Prater v. Ohio Educ. Ass'n, 505 F.3d 437, 441 (6th Cir. 2007) (citing McCoy v. Meridian Auto. Sys., 390 F.3d 417, 422 (6th Cir. 2004)). Thus, the Court will limit its review to the express terms of the Agreements in question, unless it finds those Agreements to be ambiguous.

[5]Portions of the 1972 CBA are filed at Document #34-5 and Document #35-3.

no cost to the Employee until he reaches age 65 or dies."[6] Doc. #35-3 (1972 CBA) at 9, ¶16F. At age 65, all benefits terminate, except life insurance which is reduced, in accordance with the "Age-Retirement Reduction" provision. Id. at 9, ¶16F; id. at 10, ¶2.

The Agreement goes on to provide that, if an employee is separated from employment for any reason other than total and permanent disability between ages 55 and 65 and has been enrolled in the life insurance plan for five years, the employee "shall continue to have the reduced life insurance benefits at no cost to him," with reductions as provided later in the Agreement. Doc. #35-3 (1972 CBA) at 9, ¶16G; id. at 10, ¶2.

With regard to employee benefits for retirees, NCR wrote a "clarification letter" to this Agreement. This letter provided that, in general, employees who retired prior to age 65 "are provided the group benefits set forth in Attachment #2". Id. at 12. Attachment #2 indicates that these retirees were entitled to receive life insurance benefits "at the same amount[] as immediately prior to Retirement and continued to age 65 at which time the . . . Life Insurance is reduced according to the provisions of the Group Benefits Plan for Age-Retirement Reduction." Id. at 10, 17. Once these retirees attained the age of 65 and for those employees who

---

[6]In general, life insurance benefits hinged on the employee's hourly wage. For example, if an employee earned an hourly rate of at least $3.13, but less than $3.55, the amount of the life insurance benefit was $8,000. Doc. #34-5 (1972 CBA) at 8.

retired at or after age 65, the clarification letter provided that they "are provided the group benefits as set forth in Attachment #1" to that letter. Id. at 12. Attachment #1 makes no specific mention of life insurance benefit availability for these retirees. See id. at 13-16 (providing detailed information about medical insurance coverage, but omitting discussion of life insurance coverage).

### 2.    Age-Retirement Reduction Provision

The Agreement's Age-Retirement Reduction provision provides that the amount of life insurance shall be reduced by 20% as of the earlier of "(a) the first of the month next following the Employee's 65th Birthday, or (b) the date of retirement," with further annual reductions until a minimum of 30% of the original amount is reached. Doc. #35-3 (1972 CBA) at 10.

### 3.    Termination Provisions

Regarding termination of various benefits, the Agreement provides that the group benefits plan (which contains the life insurance provisions) "shall remain in effect until the termination of the Collective Bargaining Agreement of which it is a part." Doc. #35-3 (1972 CBA) at 7.  The 1972 CBA also contains a termination provision for accidental death and dismemberment insurance (but not life insurance), which provides that the same "shall terminate upon retirement or upon the first of the month next following the Employee's 65th birthday, whichever is

earlier." Id. at 10.

4.    Tie Between Eligibility for Pension Benefits and Eligibility for Medical (not Life Insurance) Benefits

The 1972 clarification letter provides that employees who retire on or after age 55 "and who are eligible for a pension under the Retirement Plan" shall also be eligible for NCR's supplemental Medicare coverage (with no mention of life insurance), upon attaining age 65. Doc. #35-3 (1972 CBA) at 14.  That sentence is contained in the "Supplemental Plan to Medicare" provision, in Attachment #1.

B.    1975 CBA[7]

1.    Life Insurance Entitlement

Under the 1975 Agreement, if an employee receives total and permanent disability benefits, certain benefits, including life insurance "shall be continued at no cost to the Employee until he reaches age 65 or dies." Doc. #35-4 (1975 CBA) at 9, ¶(A)(6).  At age 65, all benefits terminate, except life insurance which is reduced, in accordance with the "Age-Retirement Reduction" provision. Id. at 9, ¶(A)(6); id. at 11, ¶(B).

The Agreement goes on to provide that, if an employee is separated from employment for any reason other than total and permanent disability between ages

_____

[7]Portions of the 1975 CBA are filed at Document #34-6 and Document #35-4.

55 and 65, and has been enrolled in the life insurance plan for five years, the employee "shall continue to have the reduced life insurance benefits at no cost to him," with reductions as provided later in the Agreement. Doc. #35-4 (1975 CBA) at 9, ¶(A)(7); id. at 11, ¶(B).

With regard to employee benefits for retirees, NCR wrote a "clarification letter" to this Agreement. This letter provided that, in general, employees who retired prior to age 65 "shall be eligible" for certain benefits set forth in Attachment #2 thereto. Attachment #2 states that the retirees are entitled to life insurance coverage, with 20% annual reductions in the amount of the benefit, until a minimum of 30% of the original amount is reached. Id. at 13-14, 19. Once these retirees attained the age of 65 and for those employee who retired at or after age 65, the clarification letter also provided that they "shall be eligible" for certain benefits, as provided in Attachment #1 thereto. Id. at 13. That Attachment makes no mention of life insurance benefit availability for these retirees, however. See id. at 13-18 (providing detailed information about medical insurance coverage, but omitting discussion of life insurance coverage).

2.    Age-Retirement Reduction Provision

The 1975 CBA contains an Age-Retirement Reduction provision that reads, in pertinent part, just as the provision quoted *supra* for the 1972 Agreement. Doc. #35-4 (1975 CBA) at 11.

### 3. Termination Provisions

The 1975 CBA contains termination provisions that read, in pertinent part, just as the provisions quoted *supra* for the 1972 Agreement. Doc. #35-4 (1975 CBA) at 7, 11; Doc. #34-6 (1975 CBA) at 3.

### 4. Tie Between Eligibility for Pension Benefits and Eligibility for Medical (not Life Insurance) Benefits

The 1975 CBA contains language that ties pension benefits to medical (not life insurance) benefits, just as the provisions quoted *supra* for the 1972 Agreement. Doc. #35-4 (1975 CBA) at 15.

### C. CBAs from 1977, 1980, 1983, 1986, 1989 and 1992[8]

In all relevant parts, the Agreements from 1977, 1980, 1983, 1986, 1989 and 1992 are substantially similar. Thus, the Court will set forth the applicable provisions together.

---

[8]Portions of the 1977 CBA are filed at Document #34-7 and Document #35-5. Portions of the 1980 CBA are filed at Document #34-8 and Document #35-6. Portions of the 1983 CBA are filed at Document #34-9, Document #34-10 and Document #35-7. Portions of the 1986 CBA are filed at Document #34-11 and Document #35-8. Portions of the 1989 CBA are filed at Document #34-12 and Document #35-9. Portions of the 1992 CBA are filed at Document #34-13 and Document #35-10.

1. <u>Life Insurance Entitlement</u>

If an employee receives total and permanent disability benefits, all benefits (to include life insurance) are continued until the earlier of the final monthly disability payment, retirement, recovery or death. Doc. #35-5 (1977 CBA) at 6, ¶(A)(6)[9]; Doc. #34-8 (1980 CBA) at 17, ¶(A)(5); Doc. #34-10 (1983 CBA) at 24, ¶(A)(4); Doc. #34-11 (1986 CBA) at 20, ¶(A)(4); Doc. #34-12 (1989 CBA) at 14, ¶(A)(4); Doc. #34-13 (1992 CBA) at 15, ¶(A)(4). Upon retiring from total and permanent disability, the employee "shall be eligible for reduced Life Insurance coverage provided the total amount of Life Insurance available to such Employee has not been fully paid in monthly installments." Doc. #35-5 (1977 CBA) at 6, ¶(A)(6)[10]; Doc. #34-8 (1980 CBA) at 29, ¶(D)(1), (2); Doc. #34-10 (1983 CBA) at 37-38, ¶(D)(1), (2); Doc. #34-11 (1986 CBA) at 33-34, ¶(F)(1), (2); Doc. #34-12 (1989 CBA) at 23-24, ¶(F)(1), (2); Doc. #34-13 (1992 CBA) at 25-26, ¶(F)(1), (2).

The Agreements go on to provide that, if an employee is separated from employment for any reason other than total and permanent disability after age 55, and has been enrolled in the life insurance plan for five years, the employee "shall

---

[9]The 1977 Agreement is slightly different, in that it provides that the benefits "shall be continued from the total and permanent disability effective date, at no cost to the Employee, until he reaches age 65 or dies." Doc. #35-5 (1977 CBA) at 6, ¶ (A)(6).

[10]Once again, the 1977 Agreement is slightly different, in that it provides that, at age 65, all benefits terminate, except life insurance which "shall be reduced" as explained later in the Agreement. Doc. #35-5 (1977 CBA) at 6, ¶(A)(6).

be eligible for reduced Life Insurance benefits at no cost," with reductions as provided later in the Agreement. Doc. #35-5 (1977 CBA) at 6, ¶(A)(7); Doc. #34-8 (1980 CBA) at 17 ¶(A)(6); Doc. #34-10 (1983 CBA) at 24 ¶(B)(5); Doc. #34-11 (1986 CBA) at 20, ¶(A)(5); Doc. #34-12 (1989 CBA) at 14, ¶(A)(5); Doc. #34-13 (1992 CBA) at 15, ¶(A)(5).

Certain employees who are eligible to retire[11] "shall have certain benefits continued as described" or "shall be eligible for benefits as described" later in the Agreement, or their "benefits shall be continued from the last day worked as described" later in that Agreement. Doc. #35-5 (1977 CBA) at 6-9, ¶¶(C)(1)(a)-(g); Doc. #34-8 (1980 CBA) at 17-19, ¶¶(a)-(f); Doc. #34-10 (1983 CBA) at 24-27; Doc. #34-11 (1986 CBA) at 20-21, ¶(B)(1)(a), (b)[12]; Doc. #34-12 (1989 CBA) at

_____

[11]For example, under the 1980 Agreement, employees who elect the pension supplement retirement plan option and leave employment in July 1981 (Doc. #34-8 (1980 CBA) at 17-18 ¶(C)(1)(a)) or, under the 1989 Agreement, employees who are 55 years or older, are terminated because of lay-off and elect the pension supplement retirement option (Doc. #34-12 (1989 CBA) at 15 ¶(B)(1)(a)).

[12]The cross-references in this provision were carelessly drafted. The cited reference refers the reader to "subparagraph (2)(b) (Classification II) of this SECTION 5", "subparagraph (2)(a) (Classification I) of this SECTION 5" and "subparagraph (2)(b) Classification I)". Doc. #34-11 (1986 CBA) at 20-21 ¶¶(B)(1)(a), (b). The reference fails to note the paragraph identification, in Section 5. The only paragraph that contains the relevant breakdowns is paragraph (B), but those breakdowns are in subparagraphs (3)(a)-(b), rather than subparagraphs (2)(a)-(b), as noted by the initial reference. The Court determines that the first two references should have been made to "subparagraph (B)(3)(b) (Classification II) of this SECTION 5" and "subparagraph (B)(3)(a) (Classification I) of this SECTION 5". The final reference should have been to either "subparagraph (B)(3)(b) (Classification II) of this SECTION 5" or "subparagraph (B)(3)(a) (Classification I) of this SECTION 5". It matters not to the resolution of the current case which

15, ¶(B)(1)(a), (b); Doc. #34-13 (1992 CBA) at 16, ¶(B)(1)(a), (b). Those benefits include life insurance in an amount that "shall be continued as described" in the Age-Retirement Reduction provisions. Doc. #35-5 (1977 CBA) at 10-12, ¶¶(2)(a)(6), (2)(b)(3); Doc. #34-8 (1980 CBA) at 22-23, ¶¶(2)(a)(6), (2)(b)(3); Doc. #34-10 (1983 CBA) at 24-27 (referring to Doc. #34-8 (1980 CBA) at 22-23); Doc. #34-11 (1986 CBA) at 22-23, ¶¶(B)(3)(a)(6), (B)(3)(b)(3); Doc. #34-12 (1989 CBA) at 17-18, ¶¶(B)(3)(a)(6), (B)(3)(b)(3); Doc. #34-13 (1992 CBA) at 18-19, ¶¶(B)(3)(a)(6), (B)(3)(b)(3).

### 2.   Age-Retirement Reduction Provision

The Agreements from 1977, 1980, 1983, 1986, 1989 and 1992 contain an Age-Retirement Reduction provision that reads, in pertinent part, just as the provision quoted *supra* for the 1972 and 1975 Agreements, except that certain of the later Agreements call for annual reductions of 10% rather than 20%. Doc. #35-5 (1977 CBA) at 16, ¶(B)(1) (20%); Doc. #34-8 (1980 CBA) at 28, ¶(C)(1) (20%); Doc. #34-10 (1983 CBA) at 24-27 (referring to Doc. #34-8 (1980 CBA) at

_____

provision was intended.
    Unfortunately, the confusion continues once the reader reaches the proper reference in Section 5, subparagraph (B)(3)(a)-(b). The life insurance subparagraphs (subparagraph 6 and 3, respectively) refer to "PART II, Section (C)(1) or (2)" and "PART II, paragraph (E) or (F)", without referring to the Section identification. Id. at 22, 23. The only Section that contains the appropriate information is Section 1. Id. at 31-34. Thus, the Court interprets that language to read ""PART II, Section 1(C)(1) or (2)" and "PART II, Section 1, paragraph (E) or (F)".

22-23, 28) (20%); Doc. #34-11 (1986 CBA) at 33, ¶(E) (20%); Doc. #34-12

(1989 CBA) at 23, ¶(E) (10%); Doc. #34-13 (1992 CBA) at 25, ¶(E) (10%).


3.    Termination Provisions

Regarding termination of various benefits, the Agreements provide that the

group benefits plan (which contains the life insurance provisions) "shall remain in

effect until the termination of the Collective Bargaining Agreement of which it is a

part."[13] Doc. #35-5 (1977 CBA) at 4; Doc. #34-8 (1980 CBA) at 10; Doc. #34-10

(1983 CBA) at 15; Doc. #34-11 (1986 CBA) at 11; Doc. #34-12 (1989 CBA) at

10; Doc. #34-13 (1992 CBA) at 12.  The CBAs also contain numerous clauses

calling for the termination of specific benefits for certain retired employees, on

various conditions, to wit:  medical benefits, weekly accident and sickness or

salary continuance, total and permanent disability and dental benefits. Doc. #35-5

(1977 CBA) at 10-13;Doc. #34-8 (1980 CBA) at 21-23 (also including termination

provision for accidental death and dismemberment coverage); Doc. #34-10 (1983

CBA) at 24-27 (same) (adopting Doc. #34-8 (1980 CBA) at 21-23); Doc. #34-11

(1986 CBA) at 22-24; Doc. #34-12 (1989 CBA) at 16-18; Doc. #34-13 (1992

CBA) at 17-19.  In general, these termination provisions state that the subject

benefits terminate on the last day the retiring employee worked or after a certain

_____

[13]The CBAs' pension plans contained identical language, as to those plans
remaining in effect until the termination of the CBAs. Doc. #34-7 (1977 CBA) at 5;
Doc. #34-8 (1980 CBA) at 5; Doc. #34-10 (1983 CBA) at 3; Doc. #34-11 (1986
CBA) at 5; Doc. #34-12 (1989 CBA) at 5; Doc. #34-13 (1992 CBA) at 6.

period of time has elapsed, after the last day worked.  There are subparagraphs

pertaining to life insurance, within these termination provisions, but they refer back

to the Age-Retirement Reduction provision, rather than providing for termination of

the benefit.


4.    Amendment Provisions

Both the 1989 and 1992 Agreements (but not the other four Agreements),

contain the following amendment clause, in the group benefits plan:

> [NCR] reserves all rights at any time or from time to time to amend
> the Plan in whole or in part, including the right to make any
> amendments to a contract with an Insurance Company, and the right
> to amend any rules adopted by the Company for the administration of
> the Plan.  No retroactive amendment shall be made unless required
> under ERISA, any other Federal law or under any applicable
> regulations thereunder.

Doc. #34-12 (1989 CBA) at 20, ¶(H); Doc. #34-13 (1992 CBA) at 22, ¶(H).


II.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions on
> file, together with the affidavits, if any," which it believes

13

demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must

present evidence that creates a genuine issue of material fact making it necessary

to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241,

1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250

(1986).  Once the burden of production has so shifted, the party opposing

summary judgment cannot rest on its pleadings or merely reassert its previous

allegations, it is not sufficient to "simply show that there is some metaphysical

doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986).  Rule 56(e) "requires the nonmoving party to go

beyond the [unverified] pleadings" and present some type of evidentiary material in

support of its position. Celotex, 477 U.S. at 324.  "The plaintiff must present more

than a scintilla of evidence in support of his position; the evidence must be such

that a jury could reasonably find for the plaintiff." Mich. Prot. & Advocacy Serv.,

Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and

admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III.    Analysis

Employee benefit or welfare plans are exempted from the vesting requirements that apply to pension plans. 29 U.S.C. § 1051(1).  Therefore, employers "are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78, 131 L. Ed. 2d 94, 115 S. Ct. 1223 (1995) (citation omitted). Employers may choose to vest welfare benefits, however. Sprague v. GMC, 133 F.3d 388, 400 (6th Cir. 1998) (citing, among others, Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co., 520 U.S. 510, 137 L. Ed. 2d 763, 117 S. Ct. 1513, 1516 (1997)).  In determining whether the parties to a collective bargaining agreement intended to vest those benefits, the Sixth Circuit instructs that "[c]ourts can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement.  CBAs may contain implied terms, and the parties' practice, usage, and custom can be considered." Maurer v. Joy Techs., Inc., 212 F.3d 907, 915 (6th Cir. 2000) (citing Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 311, 105 L. Ed. 2d 250, 109 S. Ct. 2477 (1989); Golden v. Kelsey-Hayes Co., 73 F.3d 648, 655 (6th Cir. 1996)).

As previously stated, the question presented in this litigation is whether the

retirees had a vested interest in the life insurance benefits, under the CBAs in effect at the time of their retirements. In resolving this question, the Court must discern the intent of the parties. Int'l Union v. Yard-Man, 716 F.2d 1476, 1479 (6th Cir. 1983) ("[W]hether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties."). In discerning that intent, "traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies." Id. (citing Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456, 1 L. Ed. 2d 972, 77 S. Ct. 912 (1957)).

Traditional rules of contract interpretation require this Court to "first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." Id. (citations omitted). "The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties." Id. at 1479-80 (citations omitted). As with all contract interpretations, the Court must construe the terms of the CBAs at issue in this case "so as to render none nugatory and avoid illusory promises." Id. at 1480. If ambiguity exists, the Court may look to other parts of the Agreements for guidance. For example, "[v]ariations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous." Id. Only if ambiguity still exists after considering the contract's language, the context of that

language and traditional canons of contract construction, may the Court consider extrinsic evidence that sheds light on the parties' original understanding of the contract's terms. <u>Prater v. Ohio Educ. Ass'n</u>, 505 F.3d 437, 441 (6th Cir. 2007) (citing <u>McCoy v. Meridian Auto. Sys.</u>, 390 F.3d 417, 422 (6th Cir. 2004)).

The Sixth Circuit has recently stated that, when interpreting CBAs to determine whether retirees' employee welfare benefits have vested, "to the extent we put a thumb on the scales in this setting, it favors vesting." <u>Reese v. CNH Am. LLC</u>, __ F.3d __ (6th Cir. 2009), 2009 U.S. App. LEXIS 16397, *11 (6th Cir. July 27, 2009).

> Although we do not apply a "legal presumption that benefits vest" and although we require plaintiffs to bear the burden of proving that vesting has occurred, we apply an "inference" that "it is unlikely that [welfare benefits] would be left to the contingencies of future negotiations," so long as we can find either "explicit contractual language or extrinsic evidence indicating" an intent to vest benefits.

<u>Id.</u> at **11-12 (quoting <u>Yolton v. El Paso Tenn. Pipeline Co.</u>, 435 F.3d 571, 580 (6th Cir. 2006)). (This "inference" is commonly referred to as the "<u>Yard-Man</u> inference", after the first case that applied such an inference, <u>UAW v. Yard-Man, Inc.</u>, 716 F.2d 1476 (6th Cir. 1983)).[14]  The Appellate Court further explains that

---

[14]The Court provides the following quote from the <u>Yard-Man</u> case, to give further context to the "inference":

> Benefits for retirees are only permissive not mandatory subjects of collective bargaining.  As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations.  The employees are presumably aware that the union owes no obligation to bargain for continued benefits for retirees.  If

while this inference is insufficient "to find an intent to create interminable benefits," on its own, it is "a nudge in favor of vesting in close cases." Id. at *12 (citing Yolton, 435 F.3d at 579-80; Yard-Man, 716 F.2d at 1482).

The Court will begin its analysis with a review of two recently decided Sixth Circuit cases, with similar facts. It will then conduct an analysis of whether the Agreements, in the present case, provide that the retirees had a vested interest in the subject life insurance benefits.

A.    Sixth Circuit Decisions in Yolton and Reese

The Sixth Circuit has recently decided two cases that are factually similar to the present one.[15] Reese v. CNH Am. LLC, __ F.3d __, 2009 U.S. App. LEXIS

_____

> they forego wages now in expectation of retiree benefits, they would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements.

Int'l Union v. Yard-Man, 716 F.2d 1476, 1482 (6th Cir. 1983) (citations omitted). In a later case, the Sixth Circuit summarized the inference, in stating that retiree benefits are "'in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." Maurer v. Joy Techs., Inc., 212 F.3d 907, 915 (6th Cir. 2000) (quoting UAW v. BVR Liquidating, Inc., 190 F.3d 768, 772 (6th Cir. 1999)).

[15]Yolton concerned a preliminary injunction that would have prevented the employer from terminating or changing health care benefits for retirees, while in Reese, the Appellate Court was reviewing the district court's grant of summary judgment, in favor of the retirees, on the issue of continuing health care benefits. Yolton, 435 F.3d 571 (6th Cir. 2006); Reese, __ F.3d __, 2009 U.S. App. LEXIS 16397 (6th Cir. July 27, 2009). The CBAs in the two cases were virtually identical, because the Yolton retirees worked at the same plant as the Reese

19

16397 (6th Cir. July 27, 2009); <u>Yolton v. El Paso Tenn. Pipeline Co.</u>, 435 F.3d

571 (6th Cir. 2006).  In both <u>Reese</u> and <u>Yolton</u>, the Appellate Court was faced

with the question of whether employees' rights to lifetime health-care benefits

vested upon their retirement.  In both cases, the Court ruled in favor of the

retirees.

In reflecting back in <u>Reese</u>, the Sixth Circuit provided the following summary

of those portions of the <u>Yolton</u> CBA that it had found to be instructive in

determining that the parties intended that the subject benefits were vested:

> [The Court] first relied on the fact that the company's benefits plans
> tied eligibility for pension benefits to eligibility for health-care benefits.
> . . .  Other aspects of the 1990 CBA, <u>Yolton</u> determined, also
> suggested an intent to create lifetime benefits.  For example, some
> benefits were subject to express durational limitations while retiree
> health benefits were not, prompting the court to conclude that "the
> inclusion of specific durational limitations in other provisions . . .
> suggests that retiree benefits, not so specifically limited, were
> intended to survive."  And the <u>Yolton</u> court also pointed to language
> in the summary plan descriptions saying that "continued coverages
> will be the same as those that were in effect on the day preceding
> your retirement."

<u>Reese</u>, 2009 U.S. App. LEXIS 16397 at **14-15 (citing <u>Yolton</u>, 435 F.3d at 582-

85) (other citations omitted).

When deciding <u>Reese</u>, the Sixth Circuit focused on similar portions of the

subject CBA, in ruling in favor of the retirees.

> Like <u>Yolton</u> this case involves a CBA; it involves a health-care benefits
> plan with identical language concerning entitlement to benefits upon

---

retirees, and the <u>Yolton</u> employer (Tenneco) was the former parent company of the
<u>Reese</u> employer (Case Corporation). <u>Reese</u>, 2009 U.S. App. LEXIS at *13.

retirement; it ties eligibility for health benefits to eligibility for a
pension; it does not contain a specific durational clause while other
benefits provisions in the CBA contain such clauses; and above all it
concerns employees who worked in virtually identical circumstances
(apparently making the same products in the same plant) to the <u>Yolton</u>
employees before each group retired.[16]

<u>Id.</u> at **15-16.[17]  In sum, therefore, the Court focused on three parts of the CBAs

when determining that the Agreements evinced sufficient intent to vest the health

care benefits, to wit:  (1) the language granting the entitlement to benefits upon

retirement ("shall be eligible"); (2) that eligibility for health benefits was tied to

eligibility for pension benefits ("employees who retire under the [pension plan]"

shall be eligible for health care benefits); and (3) that the CBA did not contain a

specific durational clause for health care benefits, yet it did contain such clauses

for other benefits provided by the CBA.

---

[16]In pertinent part, the <u>Yolton</u> CBA provided that "[e]mployees who retire
under the Case Corporation Pension Plan for Hourly Paid Employees . . . shall be
eligible" to receive health care benefits and added that "the Company shall pay the
full premium cost of the above coverages," while the <u>Reese</u> CBA provided that
"[e]mployees who retire under the Case Corporation Pension Plan . . . shall be
eligible for" health care benefits and added that "[n]o contributions are required for
the Health Care Plans." <u>Reese</u>, 2009 U.S. App. LEXIS 16397 at *13 (citations to
internal record omitted).

[17]The <u>Reese</u> employer argued that an accompanying summary plan
description indicated there was no intent to vest, when it provided that "[a]n
amendment or termination of the . . . benefit plans may affect . . . the coverage[]"
of retirees. <u>Reese</u>, 2009 U.S. App. LEXIS 16397 at *16.  The Appellate Court
found this argument to be without merit, however, because there existed a
provision, in the summary plan description, which indicated that the CBA
provisions trumped any contradictory summary plan description provisions (with
the implication being that there was a contradictory provision in the CBA). <u>Id.</u> at
**17-18.

B.    Analysis

To reduce complexity in the analysis of the present case, the Court will first

consider the six Agreements dated from 1977-1992, after which it will consider

the two earlier Agreements.


1.    CBAs from 1977, 1980, 1983, 1986, 1989 and 1992

The Court will begin by summarizing first the Plaintiffs' arguments and then

the Defendant's.  Following that, the Court will turn to an analysis of whether

there exists a genuine issue of material fact as to whether the Agreements evince a

clear intent to vest the retirees' life insurance benefits.


a.    Plaintiffs' Contentions

For ease of analysis, the Court will break down the Plaintiffs' arguments into

six categories, as follows:

- Yard-Man Inference.  The Yard-Man inference indicates that it is unlikely that the Plaintiffs would have previously left open the subject of continuing life insurance benefits to future negotiations, to which they would not have been parties. Doc. #34-2 at 30-31.

- Entitlement Language.  The Plaintiffs point to the CBA language granting them entitlement to life insurance benefits, which provides that they "shall continue" to have life insurance benefits or they "shall be eligible" for such benefits. Id. at 25-26.

- Duration Provisions.  The CBAs call for the termination of some benefits (e.g., medical benefits, weekly accident and sickness or salary continuance, total and permanent disability, dental benefits), but not for the termination of life insurance benefits. Id. at 26-27.  Plus, the general durational clause

(stating that the Agreement shall remain in effect until termination of CBA of which it is a part) is not determinative, since an identical clause is contained in the pension plans.[18] <u>Id.</u> at 30.

- <u>Age-Retirement Reduction Provision</u>. The "Age-Retirement Reduction" language (which provides for a diminution in value of life insurance benefits, upon retirement and annually thereafter, until a minimum of 30% of the original amount is reached) would be meaningless if NCR could terminate the benefit after retirement. <u>Id.</u> at 28-29.

- <u>Tie Between Life Insurance Eligibility and Pension Eligibility</u>. The following language demonstrates an intent to tie life insurance eligibility to pension eligibility:

    - Age-retirement reduction provisions that cause the amount of life insurance to reduce "on the earlier of (a) the first of the month next following the Employee's 65th birthday" or (b) the <u>date of retirement</u>. <u>Id.</u> at 32 (emphasis in original).

    - To be eligible for pension benefits, employees could either retire between the ages of 55 and 65 or after their 65th birthday. <u>Id.</u> (citing, e.g., Doc. #34-11 (1986 CBA) at 6, § 4(B), (C)). Likewise, employees who leave employment between the ages of 55 and 65 or after their 65th birthdays are eligible for continuation or reduced life insurance benefits. <u>Id.</u> Also, the general durational language (indicating the plan will remain in effect until termination of CBA) is identical in the pension plan and benefits plan. Doc. #44 at 12-13.

- <u>Amendment Provision</u>. In response to the Defendant's argument, set forth below and pertaining to the 1989 and 1992 CBA amendment clause, the Plaintiffs argue, among other things, that the reservation of the right to amend is not specific enough to include the right to eliminate a welfare benefit. Doc. #40 at 24.

---

[18]Pension plans are vested by law. 29 U.S.C. § 1053. Thus, a general durational clause cannot be read to mean that an employer can terminate a pension plan at the termination of a CBA.

b.    Defendant's Contentions

The Court will now similarly break down the Defendant's arguments, as

follows:

- Yard-Man Inference. Relying on extrinsic evidence in support, the Defendant argues that the Yard-Man inference is not applicable here, since the retirees remained union members and the union continued to represent them after they retired. Doc. #35-2 at 18-20. Further, even if retiree benefits are not mandatory subjects of bargaining, the union has standing to represent retirees if the union and company, in fact, bargain for retiree benefits. Doc. #43 at 21-22.

- Entitlement Language. The "shall continue" and "shall be eligible" language is insufficient to demonstrate an intent to vest. Doc. #35-2 at 13-14; Doc. #39 at 20-21; Doc. #43 at 15-16.

- Duration Provisions. Failure to provide durational limits for life insurance benefits does not, standing alone, support a vesting conclusion. Doc. #39 at 18.

- Age-Retirement Reduction Provision. The Age-Retirement Reduction provision does not establish vesting, because it merely establishes the dollar amounts of the benefits that shall continue after retirement. Doc. #35-2 at 14. As to the Plaintiffs' argument regarding this provision being "illusory", if the Defendant could terminate the benefit, the Defendant argues that there is no basis for characterizing a benefit as "illusory", since the Defendant provided the benefit for 31 years.[19] Doc. #39 at 19.

- Tie Between Life Insurance Eligibility and Pension Eligibility. There must be an explicit tie between pension eligibility and life insurance eligibility, rather than an overlap or mere coincidence, as here. Doc. #35-2 at 14-15.

---

[19]The Defendant also argues that it is not claiming that the benefit expired at the end of each CBA, but, rather, that "it had the right to terminate it at that time, or at another time, or not at all." Doc. #39 at 19. The Court finds this argument to be circular and without merit. The Plaintiffs contend that they had a vested right in the benefit, upon the expiration of each Agreement, so it is irrelevant when Defendant ultimately terminated the benefit.

- <u>Amendment Provision</u>.  Case law suggests that the amendment provision, in the 1989 and 1992 Agreements, allows Defendant to amend the plan, in whole or in part, in order to eliminate a single benefit. Doc. #35-2 at 16-17; Doc. #43 at 10-11.

### c.    <u>Court's Analysis</u>

In light of the factual similarities between the 1977-1992 Agreements and the Agreements in <u>Yolton</u> and <u>Reese</u>, and based on the application of other, related Sixth Circuit case law, the Court determines that no genuine issue of material fact exists as to whether the Agreements demonstrate a clear intent to vest the retirees' life insurance benefits.  While none of the provisions cited by the Plaintiffs may be sufficient, standing alone, to satisfy the Court of that intent, the entirety of each Agreement, when read together, provides the necessary context for that conclusion.

### i.    <u>Yard-Man Inference</u>

As to the <u>Yard-Man</u> inference, the Court agrees with the Plaintiffs. Assuming there otherwise exists an intent to vest the life insurance benefits, <u>Yard-Man</u> operates to provide an inference, in the Plaintiffs' favor, that it is unlikely that they would have left life insurance benefits to the contingencies of future negotiations. <u>Reese v. CNH Am. LLC</u>, __ F.3d __ (6th Cir. 2009), 2009 U.S. App. LEXIS 16397, **11-12 (6th Cir. July 27, 2009).  As the Plaintiffs point out, even if the union did include retirees in future negotiations, the Supreme Court has

recognized that retirees are not permissible members of collective bargaining units. Allied Chem. & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 30 L. Ed.2d 231, 92 S. Ct. 383 (1971) (finding that "industrial practice cannot alter the conclusions that retirees are neither 'employees' nor bargaining unit members").  While the Defendant is correct in noting that the Sixth Circuit has acknowledged that a union has standing to represent retirees in disputes concerning retiree benefits under collective bargaining agreements, this recognition does not alter the conclusion that "retirees are not members of the bargaining unit [and, thus], the bargaining agent is under no statutory duty to represent them in negotiations with the employer." Allied Chem., 404 U.S. at 182 n.20 (explicitly recognizing that a union may bargain for its retirees, but cautioning that "vested retirement rights may not be altered without the pensioner's consent"); see also Cleveland Elec. Illuminating Co. v. Util. Workers Union, Local 270, 440 F.3d 809, 815-16 (6th Cir. 2006) (noting that retirees may also choose to deal with the company on their own, rather than having union represent them).

    ii.    "Shall Continue" and "Shall be Eligible" Entitlement Language

As to the Agreements' "shall continue" and "shall be eligible" entitlement language, the Court finds this language to be virtually identical to the "shall be eligible" entitlement language in Reese, which the Sixth Circuit implicitly found to be sufficient to weigh in favor of finding an intent to vest. Reese v. CNH Am. LLC,

26

__ F.3d __ (6th Cir. 2009), 2009 U.S. App. LEXIS 16397, *13 (6th Cir. July 27, 2009) (noting plan's use of "shall be eligible" language).

### iii.    Durational Provisions

With regard to the Agreements' durational limits, the Court finds this argument to be one of the most compelling in favor of the retirees.  Both Yolton and Reese highlight the significance of differing treatments of durational limitations. Reese v. CNH Am. LLC, __ F.3d __ (6th Cir. 2009), 2009 U.S. App. LEXIS 16397, *16 (6th Cir. July 27, 2009) (in finding an intent to vest, noting that the agreement "does not contain a specific durational clause [for health benefits] while other benefits provisions in the CBA contain such clauses"); Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571, 581-82 (6th Cir. 2006) (finding it noteworthy that the agreement contained "specific durational limitations for workers on lay-off and on maternity leave," but not for retiree health benefits); see also Int'l Union v. Yard-Man, 716 F.2d 1476, 1482 (6th Cir. 1983) ("[T]he inclusion of specific durational limitations in other provisions of the current collective bargaining agreement suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements in the parties' contemplated long term relationship.").

A review of the present Agreements, in this regard, presents a striking contrast between the way they treat various welfare benefits for retirees.  The

provision that governs "Group Benefits Coverage for Certain Retired Employees"

covers continuing retiree eligibility for the following six benefits:  health care, life

insurance, accidental death and dismemberment, weekly accident and sickness,

total and permanent disability, and dental. <u>E.g.</u>, Doc. #34-12 (1989 CBA) at 16-

18.  Therein, the Agreements explicitly call for the termination of five of the six

benefits, upon the happening of certain events (e.g., the last day of work, 12

months from the last day of work).  The life insurance benefit is the only benefit

that does not contain any durational language.  The Court also finds the Plaintiffs'

argument compelling regarding the lack of import of the general durational

provision, as to the duration of the life insurance benefits thereunder.  As the Sixth

Circuit has recognized, "[a]bsent specific durational language referring to retiree

benefits themselves, courts have held that the general durational language says

nothing about those retiree benefits." <u>Yolton</u>, 435 F.3d at 581 (citing, among

others, <u>Yard-Man</u>, 716 F.2d at 1482).


iv.    <u>"Age-Retirement Reduction" Language</u>

The parties next dispute the significance of the "Age-Retirement Reduction"

provision to the vesting decision, with the Plaintiffs arguing that the provision

(which provides for reducing life insurance benefits by either 10% or 20%, upon

retirement and annually thereafter, until a minimum of 30% of the original amount

is reached) would be meaningless if the Defendant could terminate the benefit after

retirement, while the Defendant suggests that this provision is unrelated to vesting, in that it merely establishes the dollar amounts of the benefits that continue after retirement. The Court agrees with the Plaintiffs, on this point. Had the parties not intended that the life insurance benefit vest at the end of the CBA term, they would not have provided for future percentage reductions, as they did. If the Defendant was free to terminate the benefit anytime after the CBA expired, this reduction language would be meaningless for retirees who had not reached the 30% minimum limit. In Yard-Man, the Sixth Circuit determined that a similar provision regarding the operation of future life insurance benefits would have been illusory, if the employer could have terminated the benefits at the end of the agreement's term, which would have contradicted the general rule that courts must construe CBA terms so as to render none of them illusory or nugatory. Int'l Union v. Yard-Man, 716 F.2d 1476, 1480-81 (6th Cir. 1983) (concluding that "[i]f retiree insurance benefits were terminated at the end of the collective bargaining agreement's three-year term, [the promise to begin paying for life insurance at age 65] is completely illusory for many early retirees under age 62"). Based on this precedent, this Court concludes that the Age-Retirement Reduction language is a strong indicator that the parties intended that the retiree life insurance benefits would vest.

v.    <u>Tie Between Pension Eligibility and Life Insurance<br>Benefit Eligibility</u>

The parties next dispute whether the Agreements provide a tie between

pension eligibility and life insurance eligibility, which courts have found to be an

indicator of an intent to vest the life insurance benefits, since pension benefits are

vested by operation of law. <u>Noe v. PolyOne Corp.</u>, 520 F.3d 548, 558 (6th Cir.

2008) ("[L]anguage in an agreement that ties eligibility for retiree health benefits to

eligibility for a pension indicates an intent to vest the health benefits.").  It is

unclear whether the Defendant has overstated the Sixth Circuit's rulings, in this

area, in asserting that the Appellate Court has required an "express tie" between

pension eligibility and benefits eligibility, in order to be a helpful component in the

vesting equation.  What is clear, however, is that the Court has considered <u>some</u>

sort of tie between an employee's eligibility for the company pension plan and

eligibility for the benefit in question to be helpful in this regard. <u>See Noe</u>, 520 F.3d

at 559 (noting that key benefit provision referred to covered retirees as

"Pensioners" and also citing two provisions that identified eligible retirees as those

"who retire and who are eligible . . . for a pension"); <u>McCoy v. Meridian Auto.</u>

<u>Sys.</u>, 390 F.3d 417, 419 (6th Cir. 2004) (agreement provided benefits for retirees

who were "eligible for benefits under . . . the Company's Hourly-Rate Employees

Pension Plan").

In the present case, the Plaintiffs point to nothing that indicates there is

such a tie, in the subject Agreements.  The language they cite does nothing more

than state that some employees are eligible for life insurance on the date of

retirement (with no mention of pension eligibility),[20] while also noting similarities in

language in the pension and benefits plans (with no tie between the same).  Thus,

the CBAs do not tie benefits eligibility to pension eligibility and, in that regard, are

unhelpful in demonstrating the parties intent to vest the life insurance benefits.

vi.   <u>Amendment Clause</u>

The final provision about which the parties dispute is the amendment clause,

which is contained only in the 1989 and 1992 Agreements.  As a reminder, that

clause reads as follows:

> [NCR] reserves all rights at any time or from time to time to amend
> the Plan[21] in whole or in part, including the right to make any
> amendments to a contract with an Insurance Company, and the right
> to amend any rules adopted by the Company for the administration of
> the Plan.  No retroactive amendment shall be made unless required

---

[20]The Plaintiffs have pointed to neither a contract provision nor case law that equates the word "retire", as used in this Agreement, with the phrase "eligibility for pension benefits".  As a matter of fact, the case cited by the Plaintiffs, in support of their argument, contained an Agreement that provided that "[e]mployees <u>retiring under the [provisions] of the Morton International, Inc. Pension Plan</u> . . . may enroll themselves and eligible dependents in the Company's Health Care Plan for Retirees." <u>Moore v. Rohm & Haas</u>, 2008 U.S. Dist. LEXIS 76537, *29 (N.D. Ohio Sept. 30, 2008) (emphasis added).  The present CBAs contain no such language.

[21]Neither party has included the definitional section for the 1989 or 1992 group benefits plans, in the record.  The definitional section for the substantially similar 1986 plan provides that the word "Plan", as used in this part of the CBA, means the group benefits plan. Doc. #34-11 (1986 CBA) at 12, § 1(A).  Having no indications to the contrary, the Court will presume that the 1989 and 1992 Agreements give the same definition to the word.

> under ERISA, any other Federal law or under any applicable
> regulations thereunder.

Doc. #34-12 (1989 CBA) at 20, ¶(H); Doc. #34-13 (1992 CBA) at 22, ¶(H).  The

Defendant contends that this provision enables it to eliminate a single benefit, such

as life insurance.[22]  In response, the Plaintiffs argue, among other things, that the

reserved right is not specific enough to include the right to eliminate a welfare

benefit.

According to the Sixth Circuit, the general rule that "an existing contract

cannot be unilaterally modified . . . . applies with equal force to collective-

bargaining agreements, where employers are statutorily barred from effectuating

'unilateral modification[s] of . . . existing collective bargaining agreement[s].'"

Prater v. Ohio Educ. Ass'n, 505 F.3d 437, 443 (6th Cir. 2007) (quoting N.L.R.B.

v. Ford Bros., Inc., 786 F.2d 232, 233 (6th Cir. 1986) (per curiam) (finding that

employers' unilateral modification of existing collective bargaining agreement

violated sections 8(a)(1) and 8(a)(5) of National Labor Relations Act, 29 U.S.C.

---

[22]In support of its argument, the Defendant claims that the Supreme Court, in Curtiss-Wright Corp. v. Schoonejongen, has previously concluded that a nearly identical amendment provision "authorize[d] the employer to terminate benefits provided by a plan." Doc. #43 at 10-11 (citing Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 115 S. Ct. 1223, 131 L. Ed. 2d 94 (1995)).  A close reading of that case, however, indicates that the issue before the Court was whether a plan provision stating that "the Company" reserved the right to amend the plan "states a valid amendment procedure under § 402(b)(3) [the Employee Retirement Income Security Act of 1974, 29 U.S.C.S. § 1102(b)(3)]," rather than whether retired employees had vested benefits under the plan, the issue that presently faces this Court. See Curtiss-Wright Corp., 514 U.S. at 73-85.

158(a)(1) and (5)). The Appellate Court has modified this general rule, however, in cases where the collective bargaining agreement contains an "unqualified reservation-of-rights language that would fairly prompt a union to protest." McCoy v. Meridian Auto. Sys., 390 F.3d 417, 424 (6th Cir. 2004).

For example in Maurer v. Joy Techologies, Inc., the collective bargaining agreement language at issue read as follows:

> [The employer] reserves the right to amend or terminate any of the plans. The right to amend includes the right to curtail or eliminate coverage for any treatment, procedure, or service regardless of whether you are receiving treatment for an injury, illness, or disease contracted prior to the effective date of the amendment.

Maurer, 212 F.3d 907, 913 (6th Cir. 2000). In later describing its decision in Mauer, the Sixth Circuit opined that the afore-cited language

> does not limit the scope of coverages affected and most notably permits the employer to terminate coverages upon which employees and retirees had already come to depend and indeed with respect to medical treatments they already were receiving. The language also is unlimited in its explanation for terminating coverage, providing a right to terminate coverages at any time, regardless of any collective bargaining agreement already in place or any future collective bargaining negotiations. Because the language in Maurer announced a unilateral right by the employer to terminate coverage without regard to existing or future collective bargaining agreements, that reservation of rights fairly should have prompted the union immediately to protest--and file a grievance--if it disagreed with the employer's assertion of authority.

McCoy v. Meridian Auto. Sys., 390 F.3d 417, 424-25 (6th Cir. 2004). Using that analysis as backdrop, the Court went on to conclude that the agreement it was considering in the later case, McCoy v. Meridian Automotive Systems, did not

provide a sufficiently explicit reservation of rights, to override the general

presumption that a party cannot unilaterally amend an existing agreement.  The

McCoy plan language read as follows:

> The Plan may be amended at any time and in any manner by [the
> employer].  While [the employer] intends to continue the plan
> indefinitely, it reserves the right to terminate all or part of the Plan at
> any time, and cancel all or part of the coverages and benefits under
> the Plan.  Any such action would be taken only after careful
> consideration and subject to the provisions of any applicable collective
> bargaining agreement.

Id. at 424.  The Court found that this language did not contain the same kind of

"explicit and sweeping authority to retract coverage," as was contained in the

Mauer agreement and, thus, was not specific enough for union leaders to protest

the inclusion of the same.  Id. at 425.

In similar fashion, this Court concludes that the 1989 and 1992 CBAs'

amendment provisions do not contain unqualified reservation-of-rights language

that would have fairly prompted the union to protest, for two reasons.  First,

because the examples of the reasons NCR might amend the Plan include "the right

to make any amendments to a contract with an Insurance Company, and the right

to amend any rules adopted by the Company for the administration of the Plan,"

are far removed from the right to completely eliminate a benefit granted

thereunder.  Second, the amendment section ends with the proviso that "no

retroactive amendment shall be made unless required under ERISA, any other

Federal law or under any applicable regulations thereunder."  It is unclear to this

Court whether the term "retroactive amendment" applies to a situation where NCR takes away a benefit that the retirees have already begun receiving, such as the life insurance benefits at issue in this case. Since the language is not sufficiently clear to the Court, it certainly is not sufficiently clear so as to have fairly prompted the union to protest its inclusion in the Agreements. Thus, the 1989 and 1992 amendment clauses do not advance the Defendant's non-vesting position.

vii.    Conclusion

The Court finds that there is no genuine issue of material fact as to the sufficiency of the demonstrated intent to vest the retiree life insurance benefits in the CBAs from 1977, 1980, 1983, 1986, 1989 and 1992. As is more fully explained in the preceding subparagraphs, this intent is clearly manifested in the Agreements' "shall continue" and "shall be eligible" entitlement language, the fact that the Agreements call for the termination of some benefits (e.g., medical benefits, weekly accident and sickness or salary continuance, total and permanent disability, dental benefits), but not for the termination of life insurance benefits, and the Age-Retirement Reduction language. While the Agreements do not contain a tie between pension eligibility and life insurance eligibility, such is not a prerequisite to finding an intent to vest. Finally, the Yard-Man inference operates in favor of the retirees, in that it is unlikely that the employees would have left the retiree life insurance benefits to the contingencies of future negotiations.

35

Furthermore, because the intent is clearly manifested in the Agreements' language, there is no need to resort to extrinsic evidence. Therefore, the Plaintiffs' Motion for Summary Judgment (Doc. #34) is SUSTAINED, as to the CBAs from 1977, 1980, 1983, 1986, 1989 and 1992, and the Defendant's Motion for Summary Judgment (Doc. #35) is OVERRULED, as to those same Agreements.

2.    <u>1972 and 1975 CBAs</u>

The Court will begin by analyzing the language of the 1972 and 1975 Agreements, in light of the legal conclusions outlined above, to discern whether those Agreement evince a clear intent with regard to the vesting of the retirees' life insurance benefits. If not, the Court will consider the extrinsic evidence to which the parties point, in support of their arguments.

a.    <u>Agreement Language</u>

The Court will initially summarize the pertinent language, in the 1972 and 1975 Agreements. Following that summary, it will consider whether that language clearly indicates the parties' intent to vest retiree life insurance benefits.

The CBAs from 1972 and 1975 provide that, upon attaining age 65, employees receiving total and permanent disability benefits lose all benefits except life insurance, which is reduced according to the "Age-Retirement Reduction" provision. The "Age-Retirement Reduction" provision states that the amount of life

insurance shall be reduced on the earlier of the employee's 65th birthday or retirement.

The "clarification letters" provide that employees retiring prior to age 65 "are provided" or "shall be eligible" for certain benefits, to include life insurance. The two Agreements differ in the way they phrase this entitlement, to wit:

- <u>1972 CBA</u>: Retirees are entitled to life insurance benefits "at the same amount[] as immediately prior to Retirement and continued to age 65 at which time the . . . Life Insurance is reduced according to the provisions of the Group Benefits Plan for Age-Retirement Reduction."

- <u>1975 CBA</u>: Retirees are entitled to life insurance coverage, with 20% annual reductions in the amount of the benefit, until a minimum of 30% of the original amount is reached.

Once these early retirees attain age 65 and for those employees who did not retire until they reach age 65, the clarification letters go on to state that they "are provided" or "shall be eligible" for certain benefits contained in Attachment #1 thereto. Attachment #1 makes no mention of life insurance benefits.

With regard to termination language, both Agreements have general durational clauses (identical to the later Agreements), which provide that the group benefits plan shall remain in effect until the termination of the CBA. There is no termination provision specific to life insurance benefit, although there is one calling for the termination of accidental death and dismemberment insurance, upon the earlier of retirement or age 65.

Finally, the clarification letters (in Attachment #1) contain language that specifically ties pension eligibility to medical benefits (but not life insurance) eligibility. As previously mentioned, Attachment #1 has no life insurance entitlement language.

Based on the analysis set forth above with regard to the later Agreements, the Court notes that the 1972 and 1975 Agreements contain some indicia of an intent to vest retiree life insurance benefits. Specifically, there is similar definiteness in the choice of granting language ("are provided" or "shall be eligible"). Also, the "Age-Retirement Reduction" language, which provided for future reductions in benefits, would be illusory (at least as to the retirees to whom this language clearly applied - - employees retiring prior to age 65, in the 1972 Agreement, and employees retiring from total and permanent disability status, in both Agreements). Further, the Agreements contain specific termination language for at least one welfare benefit (accidental death and dismemberment insurance), with no such language for life insurance benefits.

Complicating the intent-to-vest question, however, is the fact that, except for employees retiring off of total and permanent disability status and perhaps those retiring early under the 1972 Agreement, neither the Agreements nor the clarification letters seem to provide for any life insurance benefits for retirees after attaining age 65. The lack of clarity on this point is particularly acute in the inaptly named 1972 "clarification" letter, which provides that, upon attaining age 65, early

38

retirees receive reduced life insurance benefits according to the Age-Retirement Reduction provision (under Attachment #2), while also seemingly providing that these same retirees receive no life insurance benefits at all (under Attachment #1).[23] Besides the confusion in the 1972 letter, the Court also notes the inconsistency that would result, under both Agreements, if NCR provided continuing life insurance benefits to those employees who retired off of total and permanent disability status, but not to other retirees.

The Defendant makes much of what seems to be the hole in these Agreements, as to life insurance benefits for retirees over age 65, saying that "NCR's clarification [letter] explains that employees retiring at age 65 or older would receive no life insurance benefit." Doc. #35-2 at 15. It goes without saying that this is an overstatement, in that the clarification letters certainly do not "explain" that employees retiring at age 65 or older would receive no life insurance benefit. Rather, there is simply an absence of any provision (except for employees retiring off of total and permanent disability status and the conflicting language in the 1972 letter regarding early retirees who attain age 65) that provides for such a benefit. The Plaintiffs attempt to explain the absence of the life insurance

---

[23]The Court also takes note of the tie between pension eligibility and health care benefit eligibility provided in Attachment #1, to which the Defendant points, with no corresponding tie (or any mention whatsoever of life insurance eligibility) between pension eligibility and life insurance eligibility. The Court does not make too much of this fact, however, given the absolute absence of any life insurance provisions, in Attachment #1, as will be more fully discussed herein.

language, in stating that "an employee who retired at age sixty-five or after would have already begun their cycle in the age retirement reduction schedule [so] there was no need to further mention the reduction in the [clarification letters]." Doc. #40 at 22. This argument makes no sense, though, because a benefit must first be conferred upon a retiree before the parameters of that benefit are addressed. In other words, even if an "employee" was operating under the Age-Retirement Reduction provisions, due to being over age 65, that employee's status would change once the employee retired and his or her eligibility to receive life insurance, in accordance with the Age-Retirement Reduction provisions, would have to be reestablished as a "retiree".

The Court now finds itself at an impasse. While the documents provide some indication of the parties' intent to vest retiree life insurance benefits, they also provide confusing language regarding not just the vesting of such benefits, but even the availability of such benefits to certain retirees.[24] The Court is mindful that the Sixth Circuit has stated that the Yard-Man inference works to provide "a nudge in favor of vesting in close cases." Reese v. CNH Am. LLC, __ F.3d __ (6th Cir. 2009), 2009 U.S. App. LEXIS 16397, *12 (6th Cir. July 27, 2009) (citations omitted). The lack of a clear provision of life insurance benefits for some retirees, as inconsistent as it seems to be, precludes this Court from calling this a "close

---

[24]The Court understands that at least some of these retirees have been receiving life insurance benefits, however, given their identity as Plaintiffs in this litigation.

case", at this juncture, however.

The Court is now reminded of the Sixth Circuit's caution that an employer's intent to vest welfare plan benefits must be clearly stated, <u>Sprague v. GMC</u>, 133 F.3d 388, 400 (6th Cir. 1998), while at the same time allowing for the consideration of extrinsic evidence, if ambiguity exists after considering the agreement's language and the context of that language. <u>Prater v. Ohio Educ. Ass'n</u>, 505 F.3d 437, 441 (6th Cir. 2007). Thus, the Court will now examine the extrinsic evidence to which the parties point, in further support of their arguments, to determine if such provides clarity to the question before it or, instead, presents a genuine issue of material fact, as to the same.

b.    <u>Extrinsic Evidence</u>

In support of their position that the parties' intent was that the 1972 and 1975 CBAs provide for vested retiree life insurance benefits, the Plaintiffs point to evidence that indicates that Roberta Iiames, the employee in the group benefits department who was responsible for conducting retiree exit interviews, understood from her interaction with NCR managers that retiree life insurance benefits were vested and she relayed this understanding to retiring employees, during said interviews.[25] Doc. #34-22 (Iiames Dep.) at 2-3; 8-15. The Plaintiffs also contend

_____

[25]The Plaintiffs also argue that a retiree received letters from NCR that purportedly indicated that his life insurance benefit was vested. <u>E.g.,</u> Doc. #34-2 at 33-34. That retiree, Walter Trimbach, retired in 1993 (under the terms of the

that NCR's course of conduct, in continuing to provide retiree life insurance benefits for over thirty years, further demonstrates its intent to vest those benefits, based on Sixth Circuit case law. Doc. #34-2 (Pls.' Mem. Supp.) at 35; Doc. #44 (Pls.' Reply Mem.) at 23.

In response, the Defendant points to evidence that queries to what extent Iiames discussed whether NCR could eliminate life insurance benefits for retirees, during exit interviews, as well as questioning whether she had the authority to determine the scope or nature of such benefits and further questioning whether her authority to speak about benefits to retiring employees was even relevant to the parties' intent at the time the Agreements were formed.[26] Doc. #35-2 (Def.'s Mem.

---

1992 CBA), however, making this argument inapplicable to the determination of whether there was an intent to vest life insurance benefits for retirees who retired under the 1972 and 1975 CBAs. Doc. #34-18 (Trimbach Dep.) at 2.

[26]Also, the Defendant makes the following argument relating to the 1972 and 1975 CBAs, purportedly supported by extrinsic evidence, in support of its own Motion for Summary Judgement:

> NCR provided a life insurance benefit to all its employees before, during, and after the 1972-2000 period in which UAW Local 1616 represented NCR plant and office workers in Dayton. Beginning in 1972 NCR gave the UAW members the same life insurance benefit that it provided to its other employees, and NCR's negotiators were not authorized to give a better life insurance benefit to UAW members than it provided to its other employees. The life insurance benefit that NCR had provided to its non-union employees, beginning long before 1972, was subject to NCR's reservation of the right to amend or terminate it at any time.

Doc. #39 (Def.'s Mem. O'ppn) at 20. In support of this argument, the Defendant points to the deposition testimony of Michael R. Kriner (Doc. #35-27) and Robert F. O'Connor (Doc. #35-31). Neither the memoranda nor the cited deposition

Supp.) at 22; Doc. #35-29 (McCormick Dep.) at 71-76 (indicating that McCormick

sat through hundreds of exit interviews with liames, as part of union

responsibilities, but had not heard any questions about whether company could

eliminate life insurance benefits for retirees); Doc. #39 (Def.'s Mem. Opp'n) at 30-

31; Doc. #43 (Def.'s Reply Mem.) at 25. As to its course of conduct in continuing

to pay life insurance benefits for so many years after the end of the CBAs, the

Defendant points to case law from the Second Circuit that indicates that its course

of conduct is irrelevant to the determination of its intent to vest. Doc. #43 at 26-

27 (citing Am. Fed'n of Grain Millers v. Int'l Multifoods Corp., 116 F.3d 976 (2d

---

excerpts identify these men's jobs, except to indicate that they were NCR
employees who had some knowledge of employee benefits, nor do they indicate at
what period of time they had personal knowledge of NCR's employee benefits
system. For example, Mr. O'Connor states that "corporate group benefits dictated
what the benefits would be for the entire corporation, meaning union and nonunion
. . . [and NCR] wouldn't let the union get more benefits than the rest of the
company." Doc. #35-31 (O'Connor Dep.) at 8. However, he provides no time
context for this statement, which would support the Defendant's assertion, in its
memorandum, that "[b]eginning in 1972 NCR gave the UAW members the same
life insurance benefit that it provided to its other employees, and NCR's negotiators
were not authorized to give a better life insurance benefit to UAW members than it
provided to its other employees." See also Doc. #35-27 (Kriner Dep.) at 6, 10-13
(providing no time context for his statements regarding time period in which NCR
provided benefits to union and non-union employees).

Also, Mr. Kriner's deposition is cited as support for the proposition that the
non-union group benefits plans granted NCR the right to modify or terminate said
benefits at any time. The Defendant has not provided copies of said plans,
however, which are required by the Federal Rules of Evidence. Fed. R. Evid. 1002
("To prove the content of a writing . . . the original writing . . . is required, except
as otherwise provided in these rules or by Act of Congress."). Because the
Defendant has not pointed to sufficient evidence to support the argument set forth
above, in this footnote, the Court will not consider the same when ruling herein.

Cir. 1997)).

The Court first turns to the issue of NCR's course of conduct in continuing to pay the retiree life insurance benefits for the past thirty-odd years. The Plaintiffs rely on the Sixth Circuit's opinion in Yard-Man, in support of their assertion that NCR's course of conduct demonstrates a clear intent to vest retiree life insurance benefits. In Yard-Man, the Court was faced with the question of whether retiree benefits terminated upon plant closure, since the agreement clearly provided that active employee benefits so terminated, and it also provided that the employer would provide retiree insurance benefits "equal to" the insurance benefits it provided to active employees.[27] Yard-Man, 716 F.2d at 1480. The Court initially found the "equal to" language ambiguous, in that it could be construed as "either solely a reference to the nature of retiree benefits or as an incorporation of some durational limitation as well." Id. The Court continued its analysis by considering, among other things, that the employer failed to actually terminate retiree benefits, at the time the plant closed.

> Yard-Man's own course of conduct in continuing retiree insurance
> benefits after plant closure beyond the point as which insurance
> benefits could have been terminated for active employees indicates
> that it did not consider retiree benefits to be tied to the durational
> limitations of that active group.

Id. at 1481. Based on this course of conduct and certain provisions in the

---

[27]The Yard-Man employer terminated retiree benefits upon the expiration of the collective bargaining agreement, approximately two years after the plant closed. Yard-Man, 716 F.2d at 1478.

agreement, the Court concluded that there was sufficient evidence of intent to vest the retiree benefits. Id. at 1482-83.

After inaccurately stating that the Yard-Man employer terminated active employee benefits immediately upon plant closure[28] (in contrast to waiting a few years, as it did with the retiree benefits), the Defendant attempts to distinguish Yard-Man factually from the present case, by arguing that, in the present case, NCR terminated all union and non-union retiree benefits at the same time. It then goes on to cite a Second Circuit case that determined that the fact that an employer continued providing benefits to both union and non-union employees after the expiration of the collective bargaining agreements, "hardly indicates that [the employer] believed the CBAs required it to provide those benefits," based on the apparent presumption that the non-union employees did not have a vested interest in those benefits. Am. Fed'n of Grain Millers v. Int'l Multifoods Corp., 116 F.3d 976, 981 (2nd Cir. 1997).

-------

[28]As to whether the employer had terminated the active employees benefits when the plant closed, the Court provided the following information:

> The record is silent as to whether Yard-Man terminated benefits to its active employees at plant closure in accordance with the explicit terms of the collective bargaining agreement. Therefore, we consider only Yard-Man's failure to actually terminate retiree benefits at the point it now claims controls the duration of those benefits and not Yard-Man's treatment of the active group as well. Yard-Man's actual conduct is, in any case, inconsistent with the interpretation of the agreement it now urges upon this Court.

Yard-Man, 716 F.2d at 1481 n.5.

The Court does not agree with the Defendant that <u>Yard-Man</u> is factually

different from the present case, in any significant way, on this point. The <u>Yard-</u>

<u>Man</u> Court, quite simply, found it significant that the employer continued providing

retiree benefits past the point at which it claimed it no longer had to do so. Other

courts have found this course of conduct to be equally telling in the vesting

equation and this Court does, as well. <u>Abbate</u>, 767 F.2d 52, 56 (3d Cir. 1985)

(noting that "the employer's approach would require us to believe that the

employer and its predecessor began paying into the welfare fund even though it

had no legal obligation to do so . . . [and finding] this explanation of the parties'

conduct to be most unlikely"); <u>United Steelworkers of Am., v. Connors Steel Co.</u>,

855 F.2d 1499, 1502-03 (11th Cir. 1988) (in affirming the district court opinion,

citing that court's findings of fact, which noted "[i]t is difficult to explain such

sizable expenditures by a non-eleemosynary, stockholder-owned institution without

there being a sense of legal obligation to make those expenditures"); <u>Armistead v.</u>

<u>Vernitron Corp.</u>, 1989 U.S. Dist. LEXIS 19186, 20-21 (M.D. Tenn. June 14,

1989), <u>aff'd</u>, 944 F.2d 1287, 1294 (6th Cir. 1991) (finding employer's contention

that its conduct in continuing to pay retiree benefits was entirely voluntary was

"extremely unlikely"). To the extent the Second Circuit's decision in <u>American</u>

<u>Federation of Grain Millers v. International Multifoods Corp.</u> comes to a contrary

conclusion,[29] that opinion conflicts with Sixth Circuit precedent and will not be followed, by this Court.

The Court concludes that NCR's conduct in continuing to pay retiree insurance benefits for over thirty years beyond the point as which it claims it could have terminated such benefits (at the end of the pertinent CBA terms) is sufficiently strong evidence to tip the balance in favor of the Plaintiffs, so that it need not wade through the various arguments pertaining to Iiames and her role in relaying information to retiring employees about future life insurance benefits.

###        c.    Conclusion

The Court finds that there is no genuine issue of material fact as to the sufficiency of the demonstrated intent to vest the retiree life insurance benefits in the CBAs from 1972 and 1975. As is more fully explained in the preceding subparagraphs, this intent is clearly manifested in the language of the Agreements and NCR's conduct in continuing to pay said benefits for over thirty years after the expiration of the two CBAs. Further, the Yard-Man inference serves as "a nudge in

---

[29]If NCR continued to pay non-union retiree life insurance benefits and it had no legal obligation to do so (e.g., the non-union retirees did not have a contractual right to such benefits), such corporate generosity might work against the inference that, in making such benefits available to its union retirees, NCR considered itself to be legally obligated to do so. In this case, however, there is no competent evidence indicating that NCR continued to pay life insurance benefits to non-union retirees who retired during the terms of the 1972 or 1975 CBAs or, even it if did, that it was under no legal obligation to do so.

favor of vesting in close cases." <u>Reese v. CNH Am. LLC</u>, __ F.3d __ (6th Cir. 2009), 2009 U.S. App. LEXIS 16397, *12 (6th Cir. July 27, 2009) (citing <u>Yolton</u>, 435 F.3d at 579-80; <u>Yard-Man</u>, 716 F.2d at 1482). Therefore, the Plaintiffs' Motion for Summary Judgment (Doc. #34) is SUSTAINED, as to the CBAs from 1972 and 1975, and the Defendant's Motion for Summary Judgment (Doc. #35) is OVERRULED, as to those same Agreements.

IV.    <u>Conclusion</u>

Plaintiffs' Motion for Summary Judgment is SUSTAINED, in its entirety. Doc. #34. Defendant's Motion for Summary Judgment is OVERRULED, in its entirety. Doc. #35. Judgment is to be entered on behalf of the Plaintiffs and against the Defendant.

The above captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

August 27, 2009

    /s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of record

48